**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT LOWINGER, Individually and on Behalf of All Others Similarly Situated,<br><br>                           Plaintiff,<br><br>        v.<br><br>ALLERGAN PLC, BRENTON L. SAUNDERS, NESLI BASGOZ, JOSEPH H. BOCCUZI, CHRISTOPHER W. BODINE, ADRIANE M. BROWN, CHRISTOPHER J. COUGHLIN, CAROL ANTHONY DAVIDSON, MICHAEL E. GREENBERG, ROBERT J. HUGIN, and PETER J. MCDONNELL,<br><br>                           Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Robert Lowinger ("Plaintiff") by and through his undersigned attorneys, brings this class action on behalf of himself and all others similarly situated, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Allergan plc ("Allergan" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Allergan and other related non-parties; (c) review of news articles, shareholder communications, and postings on Allergan's website concerning the Company's public statements; and (d) review of other publicly available information concerning Allergan and Defendants.

## **NATURE OF THE ACTION**

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Allergan against the Company and the members of the Company's board of directors (the "Board") for violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of Allergan.

2.      On June 25, 2019, the Board caused the Company to enter into a Transaction Agreement (the "Agreement") with Venice Subsidiary LLC ("Merger Sub"), a wholly-owned subsidiary of AbbVie Inc. ("AbbVie"). The transaction referred to in the Agreement (*i.e.* that Acquirer Sub will acquire Allergan, which will become a wholly owned subsidiary of AbbVie) is referred to herein as the "Proposed Transaction."

3.      Under the terms of the Agreement, Allergan shareholders will receive (i) $120.30 in cash and (ii) 0.8660 of a newly issued share of AbbVie common stock (the "AbbVie common stock") in exchange for each Allergan ordinary share held, which are, together, sometimes referred to herein as the "Merger Consideration." The Merger Consideration will be adjusted if it would result in the issuance of AbbVie common stock in excess of 19.99% of the aggregate shares of AbbVie common stock outstanding immediately prior to the completion of the Proposed Transaction.

4.      The consummation of the Proposed Transaction is subject to certain closing conditions, including the approval of the stockholders of Allergan. The Company expects the Proposed Transaction to close in early 2020.

5.      On September 16, 2019, in order to convince Allergan's shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a Definitive Proxy Statement

(the "Proxy Statement"), which was filed with the SEC, on Schedule 14A. The Proxy Statement is materially incomplete and misleading, in violation of Section 14(a) of the Exchange Act.

6.      While Defendants, in the Proxy Statement, tout the fairness of the Merger Consideration to the Company's stockholders, they have failed to disclose material information that necessary for Allergan's stockholders to properly assess the fairness of the Proposed Transaction, thereby rendering certain statements in the Proxy Statement incomplete and misleading.

7.      It is imperative that the material information that has been omitted from the Proxy Statement is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Section 14(a) of the Exchange Act, and Rule 14a-9.

8.      Plaintiff seeks to enjoin Defendants from holding the stockholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Allergan's stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Section 14(a) of the Exchange Act.

10.      In connection with the acts, omissions, conduct and wrongs alleged herein, Defendant used the mails and the means or instrumentalities of interstate commerce.

11.    Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District. Additionally, the Company's shares trade on the New York Stock Exchange ("NYSE"), which is headquartered in this District.

## THE PARTIES

12.    Plaintiff is, and at all relevant times has been, an Allergan stockholder.

13.    Defendant Allergan plc is an Irish public limited company with its principal executive offices located at Clonshaugh Business and Technology Park, Coolock, Dublin D17 E400 Ireland. Shares of Allergan common stock are traded on the NYSE under the symbol "AGN."

14.    Defendant Brenton L. Saunders ("Saunders") was Chairman of the Board and President and Chief Executive Officer ("CEO") of the Company at all times relevant hereto.

15.    Defendant Nesli Basgoz ("Basgoz") is, and at relevant times has been, a director of the Company.

16.    Defendant Joseph H. Boccuzi ("Boccuzi") is, and at relevant times has been, a director of the Company.

17.    Defendant Christopher W. Bodine ("Bodine") is, and at relevant times has been, a director of the Company.

18.    Defendant Adriane M. Brown ("Brown") is, and at relevant times has been, a director of the Company.

19.    Defendant Christopher J. Coughlin ("Coughlin") is, and at relevant times has been, a director of the Company, and its lead independent director.

20.    Defendant Carol Anthony Davidson ("Davidson") is, and at relevant times has been, a director of the Company.

21.     Defendant Michael E. Greenberg ("Greenberg") is, and at relevant times has been a director of the Company.

22.     Defendant Robert J. Hugin ("Hugin") is, and at relevant times has been. a director of the Company.

23.     Defendant Peter J. McDonnel ("McDonnel") is, and at relevant times has been, a director of the Company.

24.     Defendants Saunders, Basgoz, Boccuzi, Bodine, Brown, Coughlin, Davidson, Greenberg, Hugin and McDonnel are collectively referred to herein as the "Individual Defendants" and together with Allergan, as the "Defendants."

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and the other stockholders of Allergan (the "Class") as of 9:00 a.m. (Eastern Time in the U.S.) on September 16, 2019, which is referred to as the "Voting Record Time" in the Proxy Statement. Excluded from the Class are Defendants herein and any person or other entity related to or affiliated with any Defendant.

26.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. The Proxy Statement states that as of 9:00 a.m. (Eastern Time in the U.S.) on September 16, 2019, (the "Voting Record Time"), 328,096,999 Allergan ordinary shares were outstanding and entitled to vote on the Proposed Transaction. Those 328,096,999 shares are beneficially held by hundreds to thousands of individuals and entities scattered throughout the country and around the world. The actual number of public stockholders of Allergan will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.      whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy Statement in violation of Section 14(a) of the Exchange Act ("Section 14(a)");

ii.      whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy Statement.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### Allergan's Background

27.      Allergan is a global pharmaceutical leader focused on developing, manufacturing and commercializing branded pharmaceutical, device, biologic, surgical and regenerative

medicine products for patients around the world. Allergan markets a portfolio of brands and products primarily focused on four key therapeutic areas including medical aesthetics, eye care, central nervous system and gastroenterology. As part of its approach to delivering innovation for better patient care, Allergan has built a broad pharmaceutical and device research and development pipelines. Allergan has employees and commercial operations in approximately 100 countries.

28.    Allergan has acquired several drug companies recently as discussed in the Forms 10-K, filed by the Company with the SEC on February 5, 2019, and February 16, 2018 which list the following "2018 Significant Business Developments" and "2017 Significant Business Developments" including:

a.    On October 24, 2018, the Company acquired Bonti, Inc., a privately held clinical-stage biotechnology company focused on the development and commercialization of novel, fast-acting neurotoxin programs for aesthetic and therapeutic applications, for $195.0 million upfront plus contingent consideration of up to $90.0 million which may be recorded if the corresponding events become probable.

b.    On April 6, 2018, the Company completed the acquisition of Elastagen Pty Ltd, a clinical stage medical company developing medical and cosmetic treatments including recombinant human tropoelastin, the precursor of elastin, which will be combined with Allergan's existing fillers product lines. The aggregate upfront expense of $96.1 million was recorded as a component of R&D expense during the year ended December 31, 2018. Under the terms of the agreement, Elastagen Pty Ltd is eligible to receive additional contingent consideration of up to $165.0 million which may be recorded if the corresponding events become probable.

c.    On January 31, 2018, the Company completed the acquisition of Repros Therapeutics, Inc., which was accounted for as an asset acquisition as the purchase primarily

related to one asset.  The aggregate upfront expense of $33.2 million was recorded as a component of R&D expense during the year ended December 31, 2018.

       d.     On June 23, 2017, the Company acquired Keller Medical, Inc., a privately held medical device company and developer of the Keller Funnel®, to combine with the Company's leading breast implants business.

       e.     On April 28, 2017, the Company acquired Zeltiq Aesthetics, Inc. for an acquisition accounting purchase price of $2,405.4 million. Zeltiq was focused on developing and commercializing products utilizing its proprietary controlled-cooling technology platform. The Zeltiq Acquisition combined Zeltiq's body contouring business with the Company's leading portfolio of medical aesthetics.

       f.     On February 1, 2017, the Company acquired the LifeCell Corporation, a regenerative medicine company, for an acquisition accounting price of $2,883.1 million, which expanded the Company's marketed product portfolio by adding Alloderm® and Strattice®.

       g.     On July 31, 2017, the Company entered into a collaboration, option and license agreement with Lyndra, Inc. to develop orally administered ultra-long-acting (once-weekly) products for the treatment of Alzheimer's disease and an additional, unspecified indication. The total upfront payment of $15.0 million was expensed as a component of R&D expense in the year ended December 31, 2017.

      29.     On March 14, 2017, the Company entered into a strategic alliance and option agreement with Editas Medicine, Inc. for access to early stage, first-in-class eye care programs. Pursuant to the agreement, Allergan made an upfront payment of $90.0 million for the right to license up to five of Editas' gene-editing programs in eye care. Editas is eligible to receive contingent research and development and commercial milestones plus royalties based on net sales.

30.    On May 7, 2019, Allergan announced its first quarter 2019 earnings. Allergan posted stronger-than-expected first quarter earnings and boosted its full-year profit guidance. The Company's earnings release quoted Saunders as stating:

> Our first quarter results reflected continued growth of our Core Business, which increased 4.4 percent year-over-year across our four key therapeutic areas. Growth of key products such as BOTOX® Cosmetic, BOTOX® Therapeutic, VRAYLAR®, JUVÉDERM® and Lo LOESTRIN® offset declines in products that lost exclusivity and products which were divested in 2018. Many key R&D programs have made steady progress and we now anticipate five regulatory approvals over the next 18 months. I appreciate the talented Allergan colleagues around the world who are bringing our products to patients who need them and positioning Allergan for a successful 2019 and beyond.

31.    On August 6, 2019, Allergan announced its second quarter 2019 earnings. The Company announced EPS of $4.38, beating analysts' consensus by $0.04/share, and revenue of $4.09 billion, beating analysts' consensus by $159.70. Allergan also raised its revenue and earnings guidance for 2019 in connection with that announcement, which included the following quote from Saunders:

> In the second quarter of 2019, Allergan delivered steady growth in our key products including BOTOX®, VRAYLAR®, JUVÉDERM®, Lo LOESTRIN® and OZURDEX® while we continued to advance our pipeline, highlighted by the FDA's approval of VRAYLAR® (Cariprazine) for Bipolar Depression and the NDA acceptance for Bimatoprost SR for Glaucoma. Our second quarter results demonstrate the continued momentum in our business and our focus on customers. Thank you to the Allergan colleagues around the world who continue to deliver our products to the patients who need them.

**Background of the Transaction**

32.    In the first half of 2019, Allergan was facing a dwindling stock price and investor agitation to split the company up to boost profits. The Board was reportedly considering, *inter alia*, including investments in new growth opportunities, potential acquisitions, the possible sale of Allergan and/or a potential spin-off of certain of Allergan's businesses.

33.     The Board had previously formed a Mergers and Acquisitions Committee (the "M&A Committee"), to provide focused oversight on mergers, acquisitions, divestitures and other transactions. The M&A Committee was comprised of Chairman Hugin, Coughlin, and Greenberg, and Thomas C. Freyman ("Freyman").

34.     On March 13, 2019, Richard A. Gonzalez ("Gonzalez"), Chairman and Chief Executive Officer of AbbVie, called Saunders to discuss market speculation regarding a variety of potential strategic opportunities Allergan may be considering. Gonzalez indicated that if Allergan were to become interested in exploring a strategic transaction, AbbVie may be interested in discussing a possible strategic relationship.

35.     The Proxy Statement does not disclose whether the Board or the M&A Committee had authorized Saunders to have such discussions at that time.

36.     As summarized by an article entitled "Table for 2: AbbVie was Allergan's only suitor in $63B takeover that shocked the industry":

> Saunders was intrigued: The two met in person April 22, and Gonzalez—playing it coy—said AbbVie might be open to acquiring Allergan but did not make a proposal. Those hints were enough for Saunders, who told the Allergan board of directors May 1 about his discussions with Gonzalez.
>
> Over the course of the next month—with check-ins to the Allergan board's M&A committee—Gonzalez and Saunders furtively rang one another, discussing the framework of a deal without a whisper of possible price, the proxy said.
>
> May 28, Saunders and Gonzalez once again met in person and had the conversation they had been waiting for. Gonzalez, moving quickly, said AbbVie was considering an acquisition price of $174 per Allergan share, a premium of 28% to 32% of the company's share price. Saunders said he would take the proposition back to his board but admitted they would "unlikely to be interested in a transaction at that price." Gonzalez, keeping the door ajar, said he wanted to keep the channel open.
>
> After the two companies reached a mutual confidentiality agreement May 30, management teams met the following week to divulge each company's structure, business strategy, pipeline and more. Meanwhile, Saunders and Gonzalez agreed to meet once more to discuss price.

On June 7, Gonzalez said AbbVie was upping its initial offer to $184 per share. Saunders, playing hardball, asked for a higher price to take back to his board. The following day, Gonzalez reiterated his $184 per share proposal but hinted that AbbVie's board could go as high as $186.

***When the Allergan board met June 11, advisers from JPMorgan attempted to throw some cold water on the pairing, asking whether the board had considered another option beyond an acquisition and whether there were any other offers on the table. According to the proxy, AbbVie was the only suitor Allergan contacted.***

After the meeting, on June 12, Gonzalez gave his final offer: $188 per share, a 45% premium, contingent on the AbbVie board's approval June 19. Gonzalez also offered two seats on the joint company's board to Saunders and another director.

June 16, Saunders got the approval he wanted. The board unanimously agreed to move ahead on due diligence and credit applications for the deal, and AbbVie's board followed suit between June 17 and June 20. Finally, after months of work, AbbVie and Allergan shook on it June 25, when the two companies executed a transaction agreement formalizing the deal.

(emphasis added).

## The Company Announces the Proposed Transaction

37.    After markets closed on June 25, 2019, AbbVie and Allergan publicly announced

the transaction via a press release. The press release stated, in pertinent part:

**AbbVie to Acquire Allergan in Transformative Move for Both Companies**

• Provides immediate scale and profitability to AbbVie's growth platform, excluding Humira, significantly expanding and diversifying its revenue base with new therapeutic areas, including Allergan's leading medical aesthetic business

• Enhances long-term R&D funding capacity, allowing for continued investment and sustained focus on innovative science and advancement of an industry-leading pipeline

• Increases global commercial scale to further maximize the value of Allergan's attractive portfolio of fast-growing products

• Combined company will produce robust cash flow to support continued dividend growth, further investment in the pipeline and reduction of debt levels

• Transaction delivers significant and immediate accretion and provides an attractive return on invested capital

• Creates substantial value for shareholders of both companies and is expected to close in early 2020

• Allergan Shareholders will receive 0.8660 AbbVie Shares and $120.30 in cash for each Allergan Share, for a total consideration of $188.24 per Allergan Share

• Transaction equity value of approximately $63 billion

NORTH CHICAGO, Ill. & DUBLIN, IRELAND – AbbVie Inc. (NYSE: ABBV) and Allergan plc (NYSE: AGN) announced that the companies have entered into a definitive transaction agreement under which AbbVie will acquire Allergan in a cash and stock transaction for a transaction equity value of approximately $63 billion, based on the closing price of AbbVie's common stock of $78.45 on June 24, 2019.

"This is a transformational transaction for both companies and achieves unique and complementary strategic objectives," said Richard A. Gonzalez, chairman and chief executive officer, AbbVie. "The combination of AbbVie and Allergan increases our ability to continue to deliver on our mission to patients and shareholders. With our enhanced growth platform to fuel industry-leading growth, this strategy allows us to diversify AbbVie's business while sustaining our focus on innovative science and the advancement of our industry-leading pipeline well into the future."

"This acquisition creates compelling value for Allergan's stakeholders, including our customers, patients and shareholders. With 2019 annual combined revenue of approximately $48 billion, scale in more than 175 countries, an industry-leading R&D pipeline and robust cash flows, our combined company will have the opportunity to make even bigger contributions to global health than either can alone," said Brent Saunders, chairman and chief executive officer, Allergan. "Our fast-growing therapeutic areas, including our world class medical aesthetics, eye care, CNS and gastrointestinal businesses, will enhance AbbVie's strong growth platform and create substantial value for shareholders of both companies."

**Strategic Rationale**

• New growth platforms and leadership positions to diversify and expand revenue base: The combined company will consist of several attractive franchises with leadership positions across immunology, hematologic oncology, medical aesthetics, neuroscience, women's health, eye care and virology. Allergan's product portfolio will be enhanced by AbbVie's commercial strength, expertise and international infrastructure.

• **Immediate scale and enhanced profitability for AbbVie's growth platform:** AbbVie's enhanced growth platform, comprised of growing and durable franchises across highly-attractive therapeutic areas, is expected to grow at a high-single digit annual growth rate well into the next decade, from more than $30 billion in 2020.

- **Financially attractive with immediate EPS accretion:** This transaction is expected to be 10% accretive to adjusted earnings per share over the first full year following the close of the transaction, with peak accretion of greater than 20%. 1 ROIC is expected to exceed AbbVie's cost of capital within the first full year.

- **Significant cash flow generation:** The success and scale of the combined commercial business ensures funding capacity and flexibility for simultaneous robust pipeline investment, debt reduction and capital return to shareholders. The combined companies generated $19 billion in operating cash flow in 2018.

* * *

**Transaction Details**

Under the terms of the Transaction Agreement, Allergan Shareholders will receive 0.8660 AbbVie Shares and $120.30 in cash for each Allergan Share that they hold, for a total consideration of $188.24 per Allergan Share.[] The transaction represents a 45% premium to the closing price of Allergan's Shares on June 24, 2019.

AbbVie anticipates that the Acquisition will provide annual pre-tax synergies and other cost reductions of at least $2 billion in year three while leaving investments in key growth franchises untouched. The synergies and other cost reductions will be a result of optimizing the research and early stage portfolio, and reducing overlapping R&D resources (~50%), driving efficiencies in SG&A, including sales and marketing and central support function costs (~40%), and eliminating redundancies in manufacturing and supply chain, and leveraging procurement spend (~10%). The synergies estimate excludes any potential revenue synergies.[]

AbbVie is expected to generate significant annual operating cash flow, which will support a debt reduction target of $15 to $18 billion before the end of 2021, while also enabling a continued commitment to Baa2/BBB or better credit rating and continued dividend growth.

It is expected that, immediately after the closing of the Acquisition, AbbVie Shareholders will own approximately 83% of AbbVie on a fully diluted basis and the Allergan Shareholders will own approximately 17% of AbbVie on a fully diluted basis.

## The Preclusive Deal Provisions

38.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Allergan.

39.     Specifically, pursuant to the Agreement, Defendants agreed to: (i) a strict non-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose the identity of any competing bidder and to furnish AbbVie with any competing bid within 24 hours of receipt; (iii) a matching rights provision which gives AbbVie three business days to match any unsolicited superior acquisition proposal the Board receives; and (iv) a provision that requires the Company to pay AbbVie a termination fee of $1.785 billion if the Company, among other things, signs an alternative acquisition agreement.

40.     These deal protection provisions, particularly when considered collectively, substantially and improperly limited the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Allergan.

41.     Given that the preclusive deal protection provisions in the Agreement impede a superior bidder from emerging, it is imperative that Allergan's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Transaction.

**Interests of the Officers and Directors of Allergan**
**to Completing the Proposed Transaction**

42.     As acknowledged by the Proxy Statement, "some of Allergan's directors and executive officers have interests in the proposed transaction that are in addition to, or different from, any interests of Allergan's shareholders generally"

43.     The following, taken from the Proxy Statement, shows the potential payouts to Allergan's officers and directors as a result of their exchange of shares of Allergan for the Merger Consideration:

| Name | Cash ($) | Equity ($) | Perquisites/ Benefits($) | Total ($) |
|------|----------|------------|--------------------------|-----------|
| Brenton L. Saunders | 14,882,877 | 23,625,381 | 154,037 | 38,662,295 |
| Matthew W. Walsh | 5,049,863 | 8,887,319 | 91,942 | 14,029,124 |
| William Meury | 5,797,055 | 7,093,432 | 90,004 | 12,980,491 |
| C. David Nicholson | 5,797,055 | 6,925,304 | 67,587 | 12,789,946 |
| A. Robert D. Bailey | 4,769,315 | 4,826,886 | 90,206 | 9,686,407 |

44.    Allergan's directors and officers stand to further profit from the Proposed Transaction. The Proxy Statement discloses that:

> Prior to the effective time, Allergan may grant retention and/or transaction incentive bonuses to employees of Allergan (other than Mr. Saunders). The aggregate amount of such retention and/or transaction incentive bonuses shall not exceed $65 million, consisting of $50 million pursuant to the terms of the Transaction Agreement, plus an additional $15 million that was expressly agreed to by Allergan and AbbVie after their entry into the Transaction Agreement.

45.    In addition, AbbVie's Board will include two Allergan Board members, including Saunders, if the Proposed Transaction closes.

## MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS IN THE PROXY STATEMENT

46.    Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any materially false and misleading statements or material misrepresentations or omissions. However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) of the Exchange Act.

**Material Omissions Relating to Synergies**

47.    The Proxy Statement discloses that the Board considered the "the potential to benefit from the synergies expected to result from the transaction" and that J.P. Morgan reviewed and considered "the estimated amount and timing of cost savings and related expenses and synergies expected to result from the proposed transaction as prepared by the management of

Allergan (the 'Synergies')" but the Proxy Statement fails to disclose the amount of synergies, timing, and achievability thereof that are projected to result from the Proposed Transaction.

48.     This information is material because forecasted synergies achieved as a result of a merger represent tangible value to the acquirer in the form of future cash flow and earnings above and beyond what can be achieved by the target on a stand-alone basis. Thus, the acquirer can (and should) pay a higher price as a result of the existence of cost savings and synergies. Accordingly, stockholders are entitled to understand the extent of those synergies (*i.e.*, a number or even a limited range) to determine whether they were properly accounted for in the merger consideration.

**Material Omissions Relating to J.P. Morgan's Analyses and Fairness Opinion**

49.     The Proxy Statement explains that J.P. Morgan presented the Board several financial analyses in connection with rendering its opinion as to the fairness, from a financial point of view, of the Proposed Transaction. However, the descriptions of J.P. Morgan's fairness opinion and analyses set forth in the Proxy Statement omit key underlying inputs and assumptions, rendering it impossible for Allergan's stockholders to sufficiently understand these analyses and, thus, to determine what weight, if any, to place on the analyses in casting votes in favor of, or against, the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Allergan's stockholders.

50.     J.P. Morgan's *Public Trading Multiples Analysis* fails to disclose the individual multiples and financial metrics for the companies observed by the financial advisors in the analysis. A fair summary of such an analysis requires the disclosure of the individual multiples for each company utilized or, at a minimum, the high, low, mean and median multiples. Merely providing the range that a banker applied is insufficient, as stockholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied valuation of the Company.

51.    J.P. Morgan's *Selected Transaction Analysis* similarly fails to disclose the estimated present value of the Synergies (net of estimated transaction expenses) as reflected in synergy estimates Allergan's management provided to J.P. Morgan for use in connection with that analysis.

52.    J.P. Morgan's *Value Creation Analysis* fails to disclose the estimated present value of the Synergies (net of estimated transaction expenses) as reflected in synergy estimates Allergan's management provided to J.P. Morgan for use in connection with its analysis.

53.    With respect to Analyst Price Targets, J.P. Morgan presented to Allergan's board of directors price targets of certain public equity research analysts for Allergan, which provided a reference range of $140.00 per share to $255.00 per share, with a consensus price target of $177.45 per share, and certain public equity research analysts for AbbVie, providing a reference range of $78.00 per share to $115.00 per share, with a consensus price target of $89.27 per share. The Proxy Statement fails to disclose which public equity research analysts were reviewed and each of their specific price targets.

54.    When an investment bank's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

**Material Omissions Relating to the Background of the Proposed Transaction**

55.    The Proxy states that Saunders first apprised the directors of his discussions with Gonzalez on May 1, 2019. However, the Proxy fails to disclose whether Saunders' contacts with

Gonzales had been approved by the Board prior to their first in-person meeting, which was five weeks after the initial contact of Saunders by Gonzalez.

56.     The omission of the foregoing information renders the statements in the "Recommendation of the Allergan Board of Directors and Allergan's Reasons for the Transaction" and "Opinion of J.P. Morgan Securities LLC" sections of the Recommendation Statement materially misleading in contravention of the Exchange Act.

<strong>COUNT I</strong>

<strong>(AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14-9 PROMULGATED THEREUNDER)</strong>

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     Section 14(a)(1) makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

59.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

60.     Defendants have issued the Proxy Statement with the intention of soliciting stockholders support for the Proposed Transaction. Each Defendant reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections for the Company and the fairness opinion of Allergan's financial advisor.

61.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each Defendant, by virtue of their roles as officers and/or directors, was aware of the omitted information but failed to disclose such information, in violation of Section 14(a). Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

62.     Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

63.     Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

64.    Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, Defendants were intricately involved in the process leading up to the signing of the Agreement and the preparation of the Company's financial projections.

65.    The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

66.    Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the stockholders vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy Statement;

C.    Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: September 26, 2019                Respectfully Submitted,

**ABRAHAM, FRUCHTER &
TWERSKY, LLP**

/s/  Michael J. Klein
Jeffrey S. Abraham
Michael J. Klein
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone:  (212) 279-5050
Facsimile:   (212) 279-3655
Email:        jabraham@aflaw.com
                  mklein@aflaw.com

*Attorneys for Plaintiff*